AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>2215 East Santa Clara Avenue, Apartment F,<br>Santa Ana, California<br>("SUBJECT PREMISES") | )<br>)<br>)<br>)<br>)<br>)    Case No.    8:18-MJ-338 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the    Central    District of    California    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(5)(B) and<br>18 U.S.C. § 2252A(a)(2)(A) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Mark W. Burnett, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and state:  Santa Ana, California

_____
*Judge's signature*

Honorable John D. Early, United States Magistrate Judge
*Printed name and title*

AUSA: Lim:sks

## AFFIDAVIT

I, Mark W. Burnett, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since January 2006.  I am currently assigned to the Los Angeles Office, Orange County Resident Agency.  I investigate, among other things, Federal child pornography and child sexual exploitation crimes in the Central District of California.  I received training in the investigation of crimes against children during my attendance at the FBI Academy in Quantico, Virginia.  In addition, I have participated in numerous investigations of criminal activity, including the investigation of crimes against children and cybercrimes.

### II.  PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of an application for a warrant to search the property located at 2215 East Santa Clara Avenue, Apartment F, Santa Ana, California, further described below.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

1

conversations and statements described in this affidavit are
related in substance and in part only.

### III. __PREMISES TO BE SEARCHED__

4.   The premises to be searched is described in **Attachment
A** and is as follows: The property located at 2215 East Santa
Clara Avenue, Apartment F, Santa Ana, California (the "SUBJECT
PREMISES").  The SUBJECT PREMISES is an apartment within an
individually addressed building, within a large, gated, complex
of 21 other individually addressed buildings.  The complex is on
the northwest corner of Santa Clara Avenue and Pasadena Street.
Building 2215 is located approximately in the middle of the
complex.  The SUBJECT PREMISES is located on the southwest
corner of the building marked 2215.  The building is blue, gray,
and white in color, with a blue, wood-shingled roof.  The front
door of the SUBJECT PREMISES is blue and opens to the west.  The
unit number "15-F" appears on a silver/gray placard in black
letters to the right of the front door.

### IV. __ITEMS TO BE SEIZED__

5.   Based on the following, I respectfully submit that
there is probable cause to believe that the items listed in
**Attachment B**, which constitute evidence, fruits, and
instrumentalities of violations of 18 U.S.C. § 2252A(a)(5)(B)
(Possession of Child Pornography), and 18 U.S.C.
§ 2252A(a)(2)(A) (Receipt/Distribution of Child Pornography),
will be found at the SUBJECT PREMISES.

## V.  STATEMENT OF PROBABLE CAUSE

**A.   Summary of Probable Cause**

6.   From May 24, 2017, through August 11, 2017, an Undercover FBI Agent ("UC") downloaded multiple files containing images of child pornography through a file sharing, peer-to-peer program from an IP address assigned to HUGO VAZQUEZ at the SUBJECT PREMISES.

**B.   Definitions**

7.   The following definitions apply to this affidavit and Attachment B:

a.   "Child pornography," as defined in 18 U.S.C. § 2256(8)(A) and (C), is any visual depiction of sexually explicit conduct where the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, or the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

b.   "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

c.   A "Uniform Resource Locator," or "URL," is an address of a specific webpage or file on the Internet.  For example, the URL for Google is https://www.google.com.

d.   A "link," short for "hyperlink," is an HTML object that allows a computer user to jump to a new location

3

when the user clicks or taps the link.  Links are found on almost every webpage, and provide a simple means of navigating between pages on the web.

      e.   "Cloud-based storage service," as used herein, refers to a publicly accessible, online storage provider that collectors of child pornography can use to store and trade child pornography in larger volumes.  Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections.  Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time.  An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file.  Access is free and readily available to anyone who has an Internet connection.

      f.   "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.  An IP Address can be a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has one

4

Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are typically connected to the Internet via a router or hub.  In the typical situation, Internet activity from every device attached to the router or hub utilizes the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device.  Most ISPs control a range of IP Addresses.  The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during a particular online session.

g.   Individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers ("ISPs").  ISPs provide their customers with access to the Internet using telephone or other telecommunication lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information,

account application information, and other information both in computer data and written record format.

        h.   "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

        i.   The term "peer-to-peer" ("P2P") has come to describe applications or programs that allow users to exchange files with each other directly or through a mediating server, via the internet.  A decentralized peer-to-peer file transfer network does not follow a model using different clients or servers; instead, it is a network of equal peer computers that simultaneously function as both "clients" and "servers" to the other users on the same network.

        j.   File hashing or a file's hash value is a string of alpha numeric characters assigned to electronic data by a computer algorithm.  A file's hash value is sometimes referred to as the file's digital finger print because hash values are unique to individual files and no two files can have the same hash value.  Two of the most common hash value algorithms are the MD5 and the SHA1.  As discussed below, the files at issue in this case can be identified through their unique SHA1 hash value.

        C.   **Overview of Ares and P2P Networks**

        8.   I have learned the following information based on my training and investigations experience, as mentioned above:

        a.   P2P file sharing is a method of communication available to internet users through the use of special software. Computers linked together through the internet using this

software form a network that allows for the sharing of digital files between users on the network.  A user first obtains the P2P software, which can be downloaded from the internet.  In general, P2P software allows the user to set up file(s) on a computer to be shared with others running compatible P2P software.  A user obtains files by opening the P2P software on the user's computer, and conducting a search for files currently being shared on the network.

      b.    Ares is the name of a P2P network and a P2P software that allows a computer to connect to a network to share files.  Ares allows searches by keywords. The results of a keyword search are displayed to the user.  The user then selects file(s) from the results for download.  The download of a file is achieved through a direct connection between the computer requesting the file and the computer(s) sharing the file.

      c.    For example, a person interested in obtaining images of child pornography would open the P2P application on his/her computer and conduct a keyword search for files using a term such as "preteen sex."  The search is sent out over the network of computers using compatible P2P software.  The results of the search are returned to the user's computer and displayed. The user selects the file(s) he/she wants to download from the results displayed.  The file is downloaded directly from the computer sharing the file.  The downloaded file is stored in the area previously designated by the user and/or the software.  The downloaded file remains until moved or deleted.

     d.   The Ares Network bases its file shares on the Secure Hash Algorithm ("SHA1"). This mathematical algorithm allows for the unique identification of files. The SHA1 is called secure because it is computationally infeasible for two files with different content to have the same SHA1 hash value.

**D.   Probable Cause**

9.   On or about May 2, 2018, I received and reviewed documentation prepared by an undercover FBI Agent and FBI Intelligence Analyst Kristin Phirippidis.  The documentation detailed an undercover investigation conducted from the FBI's Sacramento Division, Fresno Resident Agency, in which an undercover FBI Agent downloaded, via the Ares P2P network, files containing child pornography from a computer located in Santa Ana, California.  The documentation was provided to me, for my review, and for purposes of opening an investigation in the Central District of California, where the child pornography was determined to be downloaded.  Based on the documentation, I learned the following:

     a.   On May 24, 2017, the UC was conducting an investigation into the sharing of child pornography files on the Ares P2P network.

     b.   On May 24, 2017, the UC identified a computer with the IP address 23.241.94.9 as a potential source for at least 47 files of investigative interest.

     c.   Specifically, from May 24, 2017, through August 11, 2017, the following 13 files were made available for download on the Ares network, and were downloaded by the FBI as

part of the undercover investigation, from the computer at IP
address 23.241.94.9:

| FILE NAME | DOWNLOAD DATE |
|---|---|
| pthc collector (249)(2)(2)(2)(2)(2).jpg | 5/24/2017 |
| !russian sex 12 years old (8).mpg | 5/24/2017 |
| #pthc what mom&dad don't know(2)(2)(2)(2).mpg | 5/24/2017 |
| (pthc) czech 10 (little boy)(2).mpg | 5/24/2017 |
| (pthc) vicky - cum compilation with janesa, alina, alegre - 10m(2).mpg | 5/24/2017 |
| YAP3ZWMYWZ56PODDGBESBQ6BBNLSSW2O.mpeg | 5/29/2017 |
| UW35CPNYFJMXJLJSOBEDDARFZX2AE5EW.mpg | 6/11/2017 |
| SEFOQREL2JEADVYLML3OGPLRS4M6DEVS.mpeg | 6/23/2017 |
| $resfne8.mpeg | 6/23/2017 |
| 2NE6BTY5YY2J4MRH7SWZ5HE7MSLU6HBR.jpg | 6/23/2017 |
| V6RG2LBKITCJ2OTIKOZNTOGDOQIMIFRD.MPG | 7/16/2017 |
| 3CDQAGSVRTZV6OJBC5PU72I45VFSFNMQ.avi | 8/11/2017 |
| FAFMOD22LZOSTWSC2NLQGQYDLAU7VWTP.jpg | 8/11/2017 |

    10.  On June 6, 2018, I reviewed:

        a.   The file "(pthc) czech 10 (little boy)(2).mpg"
that was downloaded on May 24, 2017.  The file is a one minute
and 20-second video of an adolescent boy, laying on a bed naked
masturbating.

        b.   The file "SEFOQREL2JEADVYLML3OGPLRS4M6DEVS.mpeg"
that was downloaded on June 23, 2017.  The file is an 18-second
video of a pre-pubescent female, with her legs spread open to

the camera, on top of an adult male.  The male appears to be holding the girl by the sides of her body while attempting to insert his erect penis into her vagina.  Neither the face of the male nor the face of the girl appear in the video.

      c.    The file "V6RG2LBKITCJ2OTIKOZNTOGDOQIMIFRD.MPG" that was downloaded on July 16, 2017.  The file is an approximately 9-second video of a close-up of a pre-pubescent female's vagina with what appears to be an animal (possibly a dog) penis penetrating or attempting to penetrate the girl's vagina or anus from behind, then ejaculating.

      d.    The file "FAFMOD22LZOSTWSC2NLQGQYDLAU7VWTP.jpg" that was downloaded on August 11, 2017.  The file is a close-up photograph of an adult male penis inserted into the anus of a female approximately 6 to 8 years old.

    11.  On or about May 25, 2018, I received documentation from Charter Communications pursuant to an administrative subpoena.  From that documentation, I learned IP address 23.241.94.9 was assigned to HUGO VAZQUEZ at the SUBJECT PREMISES at the exact dates each of the files noted above were downloaded by the UC from IP address 23.241.94.9.

    12.  On June 4, 2018, I spoke with ShaRayne Jackson, a paralegal at Charter Communications.  Ms. Jackson confirmed that IP address 23.241.94.9 was assigned to customer HUGO VAZQUEZ at the SUBJECT PREMISES for the time period covering each of the aforementioned downloads.  In addition, the paralegal stated that HUGO VAZQUEZ was, as of June 4, 2018, receiving service at the SUBJECT PREMISES.

13.  On June 15, 2018, I spoke with Claudia (last name unknown, and hereinafter referred to as "Claudia") at the management office for the complex in which the SUBJECT PREMISES is located.  Claudia told me the following:

a.  HUGO VAZQUEZ is currently listed on the lease for the SUBJECT PREMISES.  The lease is set to expire on August 31, 2018.  As of June 15, 2018, there was no notice of intent to vacate the apartment on file with management.

b.  There are three other people listed on the lease, Paul (last name unknown, or "LNU"), Silvia (LNU), and Angelica (LNU).

c.  In addition, there are two vehicles registered to the apartment, as follows: (1) a white 2015 Mercedes C300, California license plate 7LHG178; and (2) a white 2016 Toyota Tacoma, California license plate 68160RI (or possibly a 1 for the last character).

14.  On June 15, 2018, I reviewed DMV records related to California license plates 68160R1 and 7LHG178 and learned that the former is registered to Paul Martinez or Silvia Martinez at 1950 E. Santa Clara Avenue, Apartment 27, Santa Ana, California, and the latter is a leased vehicle with the lessee named as Silvia Martinez at the SUBJECT PREMISES.

15.  On June 18, 2018, I drove through the parking area of the apartment complex in which the SUBJECT PREMISES is located, and saw a white Honda Civic with California license plate 8CGV167 parked in parking space 45, one of the spaces assigned to the SUBJECT PREMISES.

16.   On June 18, 2018, I reviewed DMV vehicle registration information for California license plate number 8CGV167.   From that information, I learned that the white Honda Civic with California license plate number 8CGV167 is leased to Angelica Reyes and Hugo VAZQUEZ at 2215 E. Santa Clara Ave. 15F,[1] Santa Ana, California.

**E.   Characteristics Common to Individuals Who Receive, Distribute, Possess, or Access with Intent to View Child Pornography**

17.   Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography, are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals, including the following:

a.   Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media; or from literature describing such activity.

b.   Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including

---

[1]      As noted above and in **Attachment A**, the SUBJECT PREMESIS has "15-F" written on a silver/gray placard in black letters to the right of the front door.

photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child, or to demonstrate the desired sexual acts.

c.   Individuals who have a sexual interest in children or images of children almost always possess and maintain their "hard copies" of child pornographic material – that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc. – in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and/or videotapes for many years. In this particular case, the person with a sexual interest in children at the SUBJECT PREMESIS was in possession of images of child pornography over the course of multiple months.

d.   Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. These collections are often maintained for

several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly. Because such collections are valued highly, efforts to back up such materials in multiple forms of media are common. This can include backing up such materials in cloud storage, as well as additional hard drives, on cell phones, or other digital devices. In particular, I am aware of cases between my caseload and that of another agents on my FBI Squad where the searches revealed what appeared to be the same images and videos of child pornography on multiple digital devices.

     e.   Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/ collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

     f.   Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

     g.   Based on my training and experience, as well as my conversations with other law enforcement officers, I know

that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, viewed via computer, or uploaded onto cloud storage from a digital device.  Electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Because computer evidence is recoverable after long periods of time, and because

there is probable cause to believe that a person or persons at
the SUBJECT PREMISES were at some point in possession of child
pornography, as described herein, and likely obtained it from
some as yet unidentified source, there is probable cause to
believe that evidence of activity related to the possession and
distribution of child pornography will be found at the SUBJECT
PREMISES.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

18.  As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.  Based on my knowledge, training, and
experience, as well as information related to me by agents and
others involved in the forensic examination of digital devices,
I know that data in digital form can be stored on a variety of
digital devices and that during the search of a premises it is

not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-

17

spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

        d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the

---

       [2]   These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory

paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

      f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a

controlled laboratory environment, and can require substantial time.

g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

19. As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I know from my training and experience and my review of publicly available materials that Apple Inc., Motorola, HTC, and Samsung, among other companies, produce

devices that can be unlocked by the user with a numerical or an
alpha-numerical password, or, for some newer versions of the
devices, with a fingerprint placed on a fingerprint
sensor.  Each company has a different name for its fingerprint
sensor feature; for example, Apple's is called "Touch ID."  Once
a user has set up the fingerprint sensor feature in the security
settings of the device, the user can unlock the device by
placing a finger or thumb on the device's fingerprint sensor.
If that sensor recognizes the fingerprint or thumbprint, the
device unlocks.  Most devices can be set up to recognize
multiple prints, so that different prints, not necessarily from
the same person, will unlock the device.  In my training and
experience, users of devices with a fingerprint sensor feature
often enable that feature, because it unlocks the phone more
quickly than the entry of a passcode or password but still
offers a layer of security.

　　　20.  In some circumstances, fingerprint sensors will not
work, and a passcode must be entered to unlock the device.  For
example, with Apple, Touch ID will not work if (1) more than 48
hours have passed since the device has been unlocked, (2) the
device has been turned on or restarted, (3) the device has
received a remote lock command, or (4) five attempts to match a
fingerprint have been unsuccessful.  Other brands have similar
restrictions.  I do not know the passcodes of the devices likely
to be found at the SUBJECT PREMISES.

　　　21.  For these reasons, while executing the warrant, agents
will likely need to use the fingerprints or thumbprints of any

user(s) of any fingerprint sensor-enabled device(s) to attempt to gain access to that device while executing the search warrant. The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of HUGO VAZQUEZ during the execution of the search if HUGO VAZQUEZ is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant. The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the fingerprint sensor at the time of the search. Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

22. I believe off-site review is appropriate in this case, based on my training and experience in such investigations, because I know that persons who download and distribute child pornography over the Internet often have several digital devices, which will be time-consuming to search given the large amounts of data typically held on digital devices.

23. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

24.  For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography), and 18 U.S.C. § 2252A(a)(2)(A) (Receipt/Distribution of Child Pornography), as described above and in **Attachment B** of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in **Attachment A** of this affidavit.


_____
Mark W. Burnett, Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this _____ day of June, 2018.


_____
HONRABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PREMISES TO BE SEARCHED

The premises to be searched is described as follows: The property located at 2215 East Santa Clara Avenue, Apartment F, Santa Ana, California (the "SUBJECT PREMISES"). The SUBJECT PREMISES is an apartment within an individually addressed building, within a large, gated, complex of 21 other individually addressed buildings. The complex is on the northwest corner of Santa Clara Avenue and Pasadena Street. Building 2215 is located approximately in the middle of the complex. The SUBJECT PREMISES is located on the southwest corner of the building marked 2215. The building is blue, gray, and white in color, with a blue, wood shingled roof. The front door of the SUBJECT PREMISES is blue and opens to the west. The unit number "15-F" appears on a silver/gray placard in black letters to the right of the front door. A layout of the apartment complex, and picture of the front door of the SUBJECT PREMISES is provided below.

i





ii

## ATTACHMENT B

ITEMS TO BE SEIZED

    1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography), and 18 U.S.C. § 2252A(a)(2)(A) (Receipt/Distribution of Child Pornography), namely:

    a.   Child pornography, as defined in 18 U.S.C. § 2256(8).

    b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, download, production, shipment, order, trade, or transaction of any kind, involving child pornography.

    c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, download, production, shipment, order, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

e.   Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

f.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to cloud storage media.

g.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

h.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the SUBJECT PREMISES.

iv

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES.

j.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

k.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

v

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.  evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.   records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing

data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

**SEARCH PROCEDURES FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) to an appropriate law
enforcement laboratory or similar facility to be searched at
that location.  The search team shall complete the search as
soon as is practicable but not to exceed 120 days from the date

of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

        b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

            i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

            ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

            iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

        c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other

evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

   d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

   e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

   f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

   g. The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is

latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further or store evidence of the offenses listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of HUGO VAZQUEZ during the execution of the search and if HUGO VAZQUEZ is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, onto the fingerprint sensor of the device (only when the device has such a sensor) in order to gain access to the contents of any such device.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

xi